**WAYNE CUSIMANO, INC., Petitioner,**

v.

**John R. BLOCK, Secretary, United States Department of Agriculture, Respondent.**

**No. 81–4397.**

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1982.

---

Peter D. Derbes, New Orleans, La., for petitioner.

Margaret M. Breinholt, U.S. Dept. of Agriculture, Washington, D.C., for respondent.

Petition for Review of an Order of the Department of Agriculture.

Before WISDOM, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

This petition is for judicial review of the administrative revocation of a produce dealer's license issued to him under the Perishable Agricultural Commodities Act ("the Act"), 7 U.S.C. §§ 499a *et seq.* The principal issue concerns the constitutional validity of a provision of the Act that permits unannounced, warrantless searches and examination, section 13(a), (b), 7 U.S.C. § 499m(a), (b), of a dealer's records and

accounts that are required by the Act to be maintained by him, section 9, 7 U.S.C. § 499i. At the administrative hearing to revoke the license, the produce dealer objected to the admission of evidence [1] offered to prove a violation of the Act, as having been obtained in violation of the dealer's Fourth Amendment rights against unreasonable searches and seizures. Finding no constitutional defect in the Congressionally authorized warrantless searches in aid of the comprehensive regulatory scheme presently before us, we reject the petitioner's contention in this regard. Likewise finding no merit in other contentions advanced, we deny the petition for review.

*Context Facts*

This petition is to review an order issued as a result of an administrative complaint procedure authorized by the Act to determine regulatory violations. Section 13(c), 7 U.S.C. § 499m(c). *See* 7 C.F.R. §§ 1.130–.151. Originally enacted in 1930, the Act regulates the perishable agricultural commodities industries and promotes fair dealings in transactions with regard to fresh fruits and vegetables. Subject to limitations not here applicable, any person engaged in the business of buying or selling fresh fruits and vegetables in wholesale or jobbing quantities is required to obtain a license as a "dealer" and to comply with various detailed regulations regarding records and dealings in these perishable commodities. By the present petition for review, the petitioner-corporation ("Cusimano") seeks judicial review of an order issued by the agency, after the administrative hearing proceedings, that revoked its license as a produce dealer.

The license was revoked under authority of section 8 of the Act, § 499h(a), which permits revocation for "flagrant or repeated" violations of any of the provisions of section 2 of the Act, § 499b. The particular violation upon which revocation is based is Cusimano's failure "to account and make full payment promptly," section 2(4),

---

1. The evidence consisted of the dealer's records of unpaid accounts. They had been obtained by an agricultural inspector as a result of his unannounced and warrantless inspection at the dealer's premises.

§ 499b(4), on 150 lots of produce obtained from eighteen produce dealers in an amount exceeding $135,000 purchased by Cusimano between June 1978 and September 1979. The administrative regulations that require "full payment promptly" define this as requiring payment for produce purchased by a buyer within ten days, 7 C.F.R. § 46.2(aa)(5), absent express agreement to pay at some other time, § 46.2(aa)(9).

At the time of the hearing in July, 1980, Cusimano's witness did not deny the substance of the complaint as to the long unpaid June 1978–September 1979 accounts. Her sole testimony, with regard to them, was: " * * * we contacted each of our creditors and made arrangements for payment, and now payments are being made each week to those whom we still owe." No documentary or other evidence was introduced in support of this statement.

By its petition for review, Cusimano principally contends that certain documents obtained during a warrantless examination of its files were improperly admitted, as being the fruits of an unreasonable search and seizure. Cusimano also contends (a), that substantial evidence does not support the administrative determination that its nonpayment of amounts due was "wilful" and "flagrant" so as to justify revocation (instead of merely suspension) of its license and (b), that, at any rate, the maximum penalty of revocation was not appropriate in view of the undeveloped record.

*Reasonableness of the Search; Warrant Requirement*

In its reasonable-search argument, Cusimano relies upon jurisprudential holdings that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspection of private commercial property, including the rule that warrantless searches are generally unreasonable. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 311–12, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978).

However, this decision—which invalidated Congressional authority to Occupational Safety and Health Act inspectors to make random warrantless inspections of business premises to ascertain whether they complied with the myriad of safety regulations imposed by that Act—also recognized that an exception from the search warrant requirement is recognized for pervasively regulated businesses subject to close supervision and inspection, noting that "[c]ertain industries have such a history of governmental oversight that no reasonable expectation of privacy" could exist for those engaged therein. 436 U.S. at 313, 98 S.Ct. at 1820–21. The Court's observation in these regards were based on the holdings in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

The *Colonnade-Biswell* exception to the warrant requirement was recently once again recognized and reaffirmed by the Court in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). There, pointing out that legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment, the Court held to be valid a provision of a federal mine safety statute that authorizes warrantless inspections. In so holding, referring to *Colonnade* and *Biswell, supra,* the Court stated:

> These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

452 U.S. at 600, 101 S.Ct. at 2539.

*Colonnade, Biswell,* and *Donovan, supra,* held that *Congress* could, in appropriate circumstances, validly authorize warrantless searches for specific purposes in industries comprehensively regulated, at least where the commercial owner can reasonably expect such warrantless inspection as an incident of the regulation to which he is sub-

ject. Similar to the regulated industries of those cited decisions, the present perishable commodities industry is subject to a comprehensive regulatory scheme with sufficiently defined contours as to justify Congressional authorization of warrantless examinations of business records required to be maintained by the Act, in order to effectuate statutory purposes. The Court quoted with approval: " 'The businessman in a regulated industry in effect consents to the restrictions placed upon him.' " *Marshall v. Barlow's, Inc., supra,* 436 U.S. at 313, 98 S.Ct. at 1821.

The perishable commodities industry has been pervasively regulated by the Act since 1930. It was enacted to provide regulation to protect producers of perishables, as well as consumers thereof, in a largely interstate industry subject to irresponsible business conduct and to delivery of deficient produce.[2] The licensing and record-keeping re-

quired by the Act are essential components of the regulatory scheme, as are the investigations and the suspension or revocation of licenses provided for by the Act in order to assure compliance by the licensees with the regulations established or authorized by the Act.[3] *See George Steinberg and Son, Inc. v. Butz,* 491 F.2d 988, 990 (2d Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974).

The statute specifies the records that must be maintained by licensees under the Act. They include such "as fully and correctly disclose all transactions involved in this [regulated] business." Section 9 of the Act, 7 U.S.C. § 499i. The administrative regulations issued pursuant to the Act's authorization describe with more particularity and detail the records required to be kept and maintained for two years with regard to transactions in the regulated business. 7 C.F.R. §§ 46.14–.16.

**2.** A 1955 Congressional committee report on relatively minor amendments, made to the Act enacted in 1956, summarized the purpose of the Act:

> The Perishable Agricultural Commodities Act is admittedly and intentionally a "tough" law. It was enacted in 1930 for the purpose of providing a measure of control and regulation over a branch of industry which is engaged almost exclusively in interstate commerce, which is highly competitive, and in which the opportunities for sharp practices, irresponsible business conduct, and unfair methods are numerous. The law was designed primarily for the protection of the producers of perishable agricultural products—most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing—and for the protection of consumers who frequently have no more than the oral representation of the dealer that the product they buy is of the grade and quality they are paying for.
>
> The law has fostered an admirable degree of dependability and fairness in this industry chiefly through the method of requiring the registration of all those who carry on an interstate business in perishable agricultural commodities and denying this registration to those whose business tactics disqualify them.

H.Rep.No.1196, 84th Cong., 1st Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 3701.

**3.** The regulatory scheme of the Act is summarized by a 1962 Congressional committee re-

port relative to certain technical amendments enacted that year:

> The Perishable Agricultural Commodities Act was enacted in 1930 and has continued in effect without substantial amendment. Its purpose is to suppress unfair and fraudulent practices in the marketing of fresh and frozen fruits and vegetables in interstate commerce. The act accomplishes this by (1) requiring that commission merchants, dealers, and brokers subject to the act obtain from the Secretary a license for which they must pay an annual fee and which is revocable for cause; (2) requiring that licensees keep such accounts and records as will show fully and correctly all transactions; (3) prohibiting fraudulent accounting, unjustifiable rejections or failures to deliver, and misbranding and other misrepresentations; and (4) authorizing the investigation of complaints, the issuance of reparation orders, the publication of fact concerning violations, the refusal, suspension, or revocation of licenses.
>
> \* \* \* \* \* \*
>
> Testimony of the shippers, brokers, wholesalers, and other elements of the trade in fresh and frozen fruits and vegetables who have been operating under this act is enthusiastically and almost unanimously in its support. It has brought a high degree of stability and responsibility to an industry which had frequently been beset by instability and irresponsibility. It is regarded as one of our most successful regulatory programs.

H.Rep.No.1546, 84th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong. & Ad.News 2749.

The Act further provides that the administrative agency shall have the right to inspect the records of any licensee in the investigation of complaints under the statute or to ascertain whether the licensee is maintaining the records of transactions, etc. statutorily required. Section 13(a) of the Act, 7 U.S.C. § 499m(a). The administrative regulations require a licensee to permit a representative of the regulatory agency to inspect during ordinary business hours the regulation-required records for the five specified inspection purposes provided by the Act itself. 7 C.F.R. § 46.17.

Thus, unlike the reprobated Congressional provision in *Marshall v. Barlow's, Inc., supra*—which, in authorizing administrative searches, devolved "almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search", *Id.,* 436 U.S. at 328, 98 S.Ct. at 1826—the present administrative searches authorized by statute are restricted to specified purposes. Further, the warrantless administrative examinations of the Act-specified records are reasonably related to, and required to effectuate, the statutory regulatory scheme—given both the central importance to the scheme of record-keeping, as well as the Congressionally-perceived necessity for undelayed police of transactions (including prompt payment) and dealers in the otherwise unstable and irresponsible (*see* note 3 *supra*) perishable commodities industry.

We thus find no constitutional defect in the present unannounced, warrantless administrative examination of the licensee Cusimano's statutorily-required records, nor in the statutory provisions and administrative regulations pursuant to which this examination was made. We need not address, therefore, the respondent administrator's alternative suggestion that, in any event, Cusimano expressly consented to the present examination and cannot complain of it.

*Other Contentions*

Cusimano's remaining two contentions possess little merit:

*1.* Substantial (indeed uncontradicted evidence) shows that as of the warrantless administrative examination of September 10, 1979, there were some $135,000 in accounts unpaid for more than ten days. These had resulted from 150 transactions in perishable commodities between June 1978 and September 1979 with some eighteen producers, as admitted by Cusimano's president to the examining agent. R.II, pp. 22–24. At the hearing of July 1980, by way of three-line general testimony, Cusimano's witness did state that arrangements had been made with each of the creditors and that payments were being made each week on accounts still owed. However, as the Administrative Law Judge ultimately concluded, even if additional evidence had been received to fully prove this undocumented and unsubstantiated general statement of the witness, the evidence of nonpayment over an extended period of so many transactions fully justified the revocation of Cusimano's license. ALJ Decision and Order, pp. 9–10.

The nonprompt payments constitute both "frequent" violations and also "flagrant" violations, *either* of which is a requisite for revocation of a license. Section 8(a) of the Act, 7 U.S.C. § 499h(a). The violations were obviously "frequent". They were also "flagrant" within the meaning of the Act; because of the number of unpaid transactions over a series of months, Cusimano could reasonably be held to have entered knowingly into additional transactions that were likely to be unpaid and would thus constitute additional and also willful subsequent violations of the Act. *Zwick v. Freeman,* 373 F.2d 110, 115 (2d Cir.), *cert. denied,* 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967). *See also Marvin Tragash Company v. United States Dept. of Agriculture,* 524 F.2d 1255 (5th Cir.1975); *Reese Sales Company v. Hardin,* 458 F.2d 183, 187 (9th Cir. 1972). As these decisions indicate, neither the insolvency of the licensee nor part payments on his part prevent the nonprompt payments as being "repeated" or "flagrant" so as thus to justify the revocation of a license for violation of the prompt-payment regulation.

■ **2.** Cusimano complains that the maximum sanction of revocation was arbitrary, in view of the evidence of its witness that (sketchily) indicated a "slow pay" suspension situation rather than a "no pay" revocation stance.[4] Judicial review of an administrative sanction is extremely limited. The administrator's selection of the appropriate sanction to effectuate the statutory policy is one peculiarly within the administrative competence, and the administrative choice of sanction is not to be overturned on judicial review unless found to be either unwarranted in law or else without justification in fact. *Butz v. Glover Livestock Commission Company, Inc.,* 411 U.S. 182, 185–186, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973); *J. Acevedo and Sons v. United States,* 524 F.2d 977 (5th Cir. 1975).

**4.** This contention is in large part based upon the Administrative Law Judge's initial concern as to this issue, as stated in an interlocutory order issued on January 7, 1981, some six months after the hearing. Based on the Cusimano witness's testimony that arrangements were being made to pay the unpaid sellers, the ALJ was concerned that a "slow pay" (rather than "no pay") situation might be shown that might permit the lesser sanction of suspension. The ALJ therefore entered an order requiring re-audit of the records to develop this "key point" in the interest of the proper administration of justice.

On March 9, some two months later, the administrative agency filed an objection to this "Order for Additional Evidence" and moved for its withdrawal on two grounds: (1), that substantial evidence proved the repeated and flagrant violation by the many nonpayments, and that Cusimano had failed to rebut this evidence by its uncorroborated allegations by the witness (the wife of Cusimano's owner) unsupported by documentation to the effect that there *had* been payment although slow; and (2), that requiring a re-audit would detrimentally interfere with the administration of the Act under the circumstances and that, in any event, the burden of going forward was upon Cusimano, not the complaining administrative agency. *Cusimano did not file responsive pleadings to this motion or at any time ask that the record be reopened so as to prove that in fact payment had ever been made of the delinquent accounts.*

The ALJ's Decision and Order of June 30, 1981 (some three months after the objection to the order for additional evidence) pointed out that the evidence at the hearing was "detailed, strong, clear and unambiguous" in establishing each of the violations and that under prior administrative interpretations of the Act "the

Our previous discussion has indicated that substantial evidence supports the administrative findings that Cusimano's failures to pay promptly were both "repeated" and "flagrant". For either of these reasons, the administrative agency is authorized to revoke (instead of suspend) the license of the offender. Section 8(a) of the Act, 7 U.S.C. § 499h(a). The administrative sanction of revocation is thus both warranted in law and justified under facts properly found. We cannot question further the administrative sanction imposed. *Glover Livestock, supra.*

### Conclusion

Finding no merit to the petitioner's contentions of error, we DENY its petition for review.

PETITION FOR REVIEW DENIED.

failure to promptly pay in numerous transactions with many sellers over several months has been held to be 'willful' as well as both 'repeated' and also 'flagrant' ". the ALJ pointed out that some adverse inference that Cusimano had no corroborative evidence of payment could be drawn from Cusimano's lack of response to the order for additional evidence and, more particularly, to the agency's motion to withdraw it. The ALJ did not rely upon such inference, however. He concluded that revocation would have been warranted, even if additional evidence had been produced to corroborate Cusimano's testimony that many (some?) of the unpaid accounts had been fully satisfied at the time of the hearing many, many months after the violations occurred.

Nor do we find to be well-founded Cusimano's suggestion at oral argument that the ALJ's withdrawal of his order for additional evidence was procedurally improper. This argument is based upon the provision of 7 C.F.R. § 1.145(a) that a party who disagrees with a "decision" or "with any ruling" of the ALJ *"may"* appeal to the agency's Judicial Officer within thirty days. Although failure to appeal a *final* "decision" timely may result in its finality, 7 C.F.R. § 1.143(c), the regulations do not provide that the failure of a party to seek timely discretionary review of an *interlocutory* ruling somehow bars the trier judge from subsequently revoking it as improvidently issued upon being shown that it was erroneous. This power of the trier judge to change erroneous interlocutory rulings is also, of course, in accord with general procedural principles.

We detail these essentially irrelevant circumstances only because of the importance placed upon them by Cusimano's argument.