PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2041

———————

BEAR MOUNTAIN ORCHARDS, INC.; DEBRUYN
PRODUCE CO.; CALIFORNIA CITRUS SELECTORS
INC., d/b/a Voita West; MILLS FAMILY FARMS, INC.;
RIGBY PRODUCE, INC.;
JERRY SHULMAN PRODUCE SHIPPER, INC.;
GF MARKETING, INC.; TAYLOR FARMS
MARYLAND, INC.;
INTRADE INDUSTRIES.; SUN VALLEY POTATO
GROWER; PHILADELPHIA PRODUCE CREDIT
BUREAU; FABULOUS FRESH PRODUCE CORP.;
HARVEST FOODS CO., LTD.; MADLYN GEORGE
PRODUCE; TOM LANGE CO.; PETER RABBIT FARMS;
HYT INTERNATIONAL, INC.; MEREX FOOD CORP.


TEAMSTERS HEALTH AND WELFARE FUND
OF PHILADELPHIA
AND VICINITY; TEAMSTERS PENSION TRUST FUND
OF PHILADELPHIA AND VICINITY; TEAMSTERS
LOCAL 939 SUPPLEMENTAL INCOME FUND;
TEAMSTERS LOCAL 929,

Intervenor Plaintiffs in D.C.

v.

MICH-KIM, INC., t/a ELLIS FLEISHER
PRODUCE CO. t/a DICHTER BROS.
& GLASS, INC; ELLIS FLEISHER; JACQUELINE
FLEISHER; JEROME N. KLINE

DeBruyn Produce Co.; California
Citrus Selectors, Inc. d/b/a Voita
West; Mills Family Farms, Inc.;
Sun Valley Potato Grower;
Philadelphia Produce Credit
Bureau; Fabulous Fresh Produce
Corp.; Harvest Foods Co., Ltd.;
Madlyn George Produce; Tom
Lange Co.; Peter Rabbit Farms;
HYT International, Inc.; Merex
Food Corp.; Jerry Shulman
Produce Shipper, Inc.,

Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-07-cv-00853)
District Judge: Honorable Michael M. Baylson

Argued March 11, 2010

2

Before: AMBRO, SMITH and ALDISERT, <u>Circuit Judges</u>

(Opinion filed: October 13, 2010 )

Louis W. Diess, III, Esquire (Argued)
Maria C. Simon, Esquire
McCarron & Diess
4900 Massachusetts Avenue, N.W., Suite 310
Washington, DC   20016-0000

Kenneth D. Federman, Esquire
Melvin C. McDowell, Esquire
Rothberg & Federman
3103 Hulmeville Road, Suite 200
Bensalem, PA   19020-0000

Howard Rabin, Esquire
Howard Rabin PC
585 Stewart Avenue, Suite 440
Garden City, NY   11530

David B. Sherman, Esquire
Solomon, Sherman & Gabay
1628 John F. Kennedy Boulevard, Suite 2200
Philadelphia, PA   19107-0000

Steven E. Nurenberg, Esquire
Meuers Law Firm
5395 Park Central Court
Naples, FL   34109-0000

Counsel for Appellants

Eugene J. Malady, Esquire (Argued)
Suite 309
200 East State Street
Media, PA   19063-0000

Hristo K. Bijev, Esquire
2100 Tulare Street, Suite 407
Fresno, CA   93721

      Counsel for Appellees

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

We consider the scope of individual liability under the trust provision of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c)(2).  Appellants, producers of perishable agricultural commodities, argue that, as an officer of Ellis Fleisher Produce Co. ("Fleisher Produce"), Jacqueline Fleisher is individually liable to them under PACA for money owed by the corporation.[1]  The District Court disagreed, holding

---

[1] The corporation has also been called "Mich-Kim, Inc.," named after the Fleishers' daughters, Michele and Kim.  For simplicity's sake, we refer to it as "Fleisher Produce."

Appellants are DeBruyn Produce Co., California Citrus

4

that Mrs. Fleisher was not secondarily liable to trust creditors under PACA because she was not actively involved in running the corporation. For the reasons that follow, we affirm the judgment of no liability.

## I. PACA

In 1930, PACA was enacted "to deter unfair business practices and promote financial responsibility in the perishable agricultural goods market." *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 419 (3d Cir. 2005). It provided that "no person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time."[2] 7 U.S.C. § 499c(a). In 1984, PACA was amended "to

---

Selectors, Inc., Mills Family Farms, Inc., Sun Valley Potato Grower, Philadelphia Produce Credit Bureau, Fabulous Fresh Produce Corp., Harvest Foods Co., Ltd., Madlyn George Produce, Tom Lange Co., Peter Rabbit Farms, HYT International, Inc., Merex Food Corp., and Jerry Shulman Produce Shipper, Inc. The Bear Mountain plaintiff group is not a party to this appeal.

[2] Under PACA, a "commission merchant" is "any person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another." 7 U.S.C. § 499a(5). A "dealer" is defined as "any person engaged in the business of buying or selling in wholesale or jobbing quantities . . . any perishable agricultural commodity in interstate or

allow for a non-segregated floating trust for the protection of producers and growers." *Id.* at 420.[3]   The trust provision

foreign commerce," subject to certain enumerated exceptions, including that "no producer shall be considered as a 'dealer' in respect to sales of any such commodity of his own raising." *Id.* § 499a(6).  A "broker" is "any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser," subject to certain exceptions. *Id.* § 499a(7).   Collectively, we shall refer to commission merchants, dealers, and brokers as "produce purchasers."

[3] This new provision was enacted in light of the following congressional finding:

> It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest.

6

provided as follows:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). This provision seeks to protect "sellers of fresh fruits and vegetables" who were "'unsecured creditors and receive[d] little protection in any suit for recovery of damages where a buyer ha[d] failed to make payment as required by the contract.'" *Weis-Buy*, 411 F.3d at 420 (quoting H.R. Rep. No. 98-543 (1983), *reprinted* in 1984 U.S.C.C.A.N. 405, 406–07). The 1984 amendment "'provide[d] a remedy by impressing a trust in favor of the unpaid seller . . . on the inventories of commodities and products derived therefrom and on the proceeds of sale of such commodities and products in the

---

7 U.S.C. § 499e(c)(1).

7

hands of the commission merchant, dealer[,] or broker.'" *Id.* (quoting H.R. Rep. No. 98-543). The produce purchasers are "require[d] . . . to hold sufficient PACA trust assets in trust to pay all suppliers." *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1379 (3d Cir. 1994). In order to preserve trust benefits, "[a]n unpaid produce supplier or seller must give written notice of its intent to preserve . . . to the produce dealer, broker, or commission merchant." *Id.* at 1378 (citing 7 U.S.C. § 499e(c)(3)).

"[T]he trust provision . . . provides unpaid suppliers with priority over secured lenders with regard to PACA trust assets *held in trust* by produce purchasers." *Id.* at 1379 (emphasis in original). Federal district courts are "vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary [of Agriculture] to prevent and restrain dissipation of the trust." 7 U.S.C. § 499e(c)(5).

The theme of the PACA trust devolves to this: to benefit producers of perishable agricultural items sold nationally to consumers, PACA places duties on those entrusted with such items for sale—the licensed sellers, or "middlemen" between producers and consumers—to prefer the producers over others. In the event of a breach of those duties, "liability attaches first to the licensed seller of perishable agricultural commodities. If the seller's assets are insufficient to satisfy the liability, others may be found secondarily liable . . . ." *Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F. Supp. 703, 706 (E.D. Pa. 1994); *see also*

8

*Golman-Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000) (same); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997) (same).

"Individual liability . . . is not derived from the statutory language, but from common law breach of trust principles." *Weis-Buy*, 411 F.3d at 421; *see also Nickey Gregory Co., LLC v. Agricap, LLC*, 597 F.3d 591, 595 (4th Cir. 2010) ("General trust principles govern PACA trusts unless the principle conflicts with PACA."); *Sunkist*, 104 F.3d at 282 ("Ordinary principles of trust law apply to trusts created under PACA . . . ."). "'Under the common law, the trustee of a trust is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.'" *Weis-Buy*, 411 F.3d at 421 (quoting *Shepard*, 868 F. Supp. at 706). Following these basic trust principles, "'[a]n individual who is in the position to control the [PACA] trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act.'" *Id.* (quoting *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993) (second alteration in original)); *see also* Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, *Scott and Ascher on Trusts* § 24.2.1 (2007) ("[I]f the trustee has misappropriated trust funds due to a beneficiary, the trustee is liable in an action at law.").

9

## II.  FACTS & PROCEDURAL HISTORY

Fleisher Produce was a wholesale produce dealer in Philadelphia.  From 1982 through February 2007, the corporation was operated (at least on paper) by a husband and wife team (Ellis and Jacqueline Fleisher). Fleisher Produce then went out of business.  When it did so, it owed appellants payments for produce supplied between May 2006 and March 2007.

Under PACA, appellants became beneficiaries of a statutory trust consisting of all of the corporation's produce-related assets.  They properly preserved their status as trust beneficiaries under PACA.  After Fleisher Produce failed to pay appellants for their produce, they filed this action to enforce Fleisher Produce's trust obligations.  Not only did they sue Fleisher Produce, but Ellis and Jacqueline Fleisher as well.

In March 2007, the District Court entered an order for a preliminary injunction.  This provided all related creditors with an opportunity to intervene in this action and assert their respective claims.  In October 2007, the Court ordered *pro rata* distribution of the available trust assets to the valid PACA trust creditors.  It found that Fleisher Produce (jointly and severally with other responsible parties) owed appellants approximately $800,000.  At the same time, Fleisher Produce had only $27,500 in trust assets remaining.  It then sold its warehouse, which netted around $80,000.  There was thus no dispute that Fleisher Produce's corporate assets were insufficient to meet all

10

outstanding PACA trust claims.

The District Court granted summary judgment against Fleisher Produce and Ellis Fleisher, holding both liable for the PACA shortfalls. At the same time, the Court denied appellants' motion for summary judgment against Jacqueline Fleisher. In its order, the Court began by conceding that we (the Third Circuit Court) "ha[d] not produced a clear, bright-line rule for determining when liability attache[d]" under PACA. Nevertheless, it concluded that related precedent from our Court, as well as from our sister Courts of Appeals, "consistently expressed concern that liability only be imposed where involvement with the corporation is sufficient to establish some significant relationship between the individual and the corporation." It added that "[o]nly if the plaintiff can demonstrate that such a relationship existed through evidence of *active involvement, not simply* evidence that the defendant was in a *position of control*, can the individual be held legally responsible for acting on behalf of the corporation." (Emphases added.)

The District Court then held a bench trial on the issue of Mrs. Fleisher's individual liability under PACA, describing the "main issue" as "whether . . . Jacqueline Fleisher is secondarily liable for Plaintiffs' claims . . . under [PACA]." Following the

11

trial (and an additional round of briefing),[4] the Court concluded that, "although Mrs. Fleisher was an employee of the company for a time, the facts showed that she was not involved in any of the fundamental business decisions, and [that] there was no evidence that she had any managerial role in the operation of the company." It added that, "even assuming that Mrs. Fleisher was a director and/or officer during the relevant periods of time, . . . there is no evidence that [she] was actively involved in running the corporation." In this context, she was not secondarily liable under PACA.

Appellants then filed a timely notice of appeal.[5] In that appeal, they focus solely on Mrs. Fleisher's status as an officer, and not on any claim relating to whether she was a director of Fleisher Produce.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 7 U.S.C.

---

[4] The District Court "gave Plaintiffs' counsel the opportunity to brief several issues, including: (1) whether Mr. Fleisher had succeeded in removing Mrs. Fleisher as officer and director under Pennsylvania law; and (2) whether Mrs. Fleisher's involvement with the company was sufficient under [PACA] to impose liability on her."

[5] Fleisher Produce and Mr. Fleisher did not appeal the summary judgment order against them.

§ 499e(c)(5)(i).  We have jurisdiction under 28 U.S.C. § 1291.

To the extent that the issues on appeal involve questions of law, we exercise *de novo* review.  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 230 (3d Cir. 2007).  To the extent that the District Court made findings of fact, we review them for clear error.  *Id.*

## IV.  ANALYSIS

Whether Jacqueline Fleisher is individually liable under PACA turns not on whether she nominally held an officer (or, if argued, director) position, nor even the size of her shareholding, but whether she had the authority to direct the control of (*i.e.*, manage) PACA assets held in trust for the producers.  If so, she is secondarily liable for breaching the duty to preserve the PACA trust.  If not, then only the corporation itself and Mr. Fleisher were responsible for the breach and therefore liable for the shortfall under PACA.  The test for individual liability thus continues un-brightlined, as each case depends on facts found by the trier at trial (or the District Court at summary judgment when there is no genuine issue of material fact).

Mrs. Fleisher's involvement with the corporation is a matter of considerable dispute.  Indeed, the parties cannot even agree on whether Mrs. Fleisher was an officer of the corporation during the relevant time period, to say nothing of the legal analysis that should follow once her formal status is settled.

13

Appellants argue that Mrs. Fleisher was an officer throughout the relevant time period and that, as a corporate officer, she was necessarily in a position to control the PACA trust assets. Indeed, when Mr. and Mrs. Fleisher set up the corporation's bank signature cards, she signed as Fleisher Produce's Vice President[6] (to say nothing of other documents that list her as its Secretary and Treasurer). Mrs. Fleisher counters that she was an officer only until June 20, 2005. In addition, she contends that, regardless of her formal title, she was not in a position to control the PACA trust assets during the relevant time period.

We conclude that, no matter Mrs. Fleisher's title(s) or ownership status during the relevant time period, the evidence presented at trial established that she did not possess the power to manage plaintiffs' PACA assets. Supporting this conclusion is that, among other things, the District Court found that all management decisions were made by Mr. Fleisher, aided by his office manager (Estelle Matsinger). In this context, we hold that Mrs. Fleisher is not secondarily liable for the remaining shortfall under PACA.[7]

---

[6] Mr. Fleisher did not dispute this evidence. When asked by opposing counsel whether the "signature card indicate[d] that Jacqueline Fleisher [wa]s the [V]ice [P]resident," Mr. Fleisher responded as follows: "Yeah, I guess that day I decided to make her [V]ice [P]resident."

[7] We stress at the outset the narrowness of our holding. It turns on facts that were established at trial—facts that leave us

**A.     PACA Trust Liability and the "Position of Control" Test**

We have only addressed individual liability under the PACA trust provision in one previous opinion—*Weis-Buy*. There, the PACA creditors sued an individual officer and shareholder for allegedly "breach[ing] his fiduciary duty" under the PACA trust provision. *Weis-Buy*, 411 F.3d at 418.[8] We began our analysis by acknowledging that "[w]e ha[d] not previously decided whether an individual corporate officer can be held liable for breaching his or her fiduciary duty to protect PACA trust assets." *Id.* at 420–21. From there, we explained that the other Courts of Appeals to have "considered this issue . . . concluded that individual liability does exist in *certain circumstances*." *Id.* at 421 (emphasis added). We then agreed to follow those Courts, and "h[e]ld that individual officers and shareholders, in certain circumstances, may be held individually liable for breaching their fiduciary duties under PACA." *Id.* At

---

with little doubt about Mrs. Fleisher's limited responsibilities and authority within the corporation. Indeed, she was at all times subordinate to her husband and his office manager. Absent similar factual findings, we would have little trouble holding against Mrs. Fleisher.

[8] We ultimately dismissed the PACA creditors' claims as untimely. Thus, we did not address the defendant's argument that "the District Court erred in finding him personally liable." *Id.* at 419.

15

the same time, we did not specify what those "certain circumstances" might be.[9]

This appeal affords us the opportunity to consider one such "circumstance"—when an officer (also a shareholder) is found not to have actual control over the management by the corporation of PACA products. Since *Weis-Buy* offers us few clues on how to address such a circumstance, we turn to the guidance available from other Courts of Appeals. *See Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701 (2d Cir. 2007); *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666 (7th Cir. 2002); *Golman-Hayden*, 217 F.3d 348; *Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1 (1st Cir. 1999); *Sunkist Growers*, 104 F.3d 280.[10] Although they have

---

[9] Similarly, in *Patterson*, the Seventh Circuit Court noted that "[u]nder certain circumstances, PACA allows produce sellers to establish a constructive trust over funds owed for sales on short-term credit and to recover against a responsible shareholder of the debtor company." *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 667–68 (7th Cir. 2002). The Court did not define what those "circumstances" were, instead reversing the judgment against the sole shareholder on alternative grounds.

[10] There have been similar decisions by various District Courts. *See, e.g., Red's Mkt. v. Cape Canaveral Cruise Line, Inc.*, 181 F. Supp. 2d 1339 (M.D. Fla. 2002); *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F. Supp. 209 (E.D.N.Y. 1993); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*,

not addressed a circumstance precisely like ours, they have each adopted a similar rule for assessing generally claims of secondary liability under PACA: "[I]ndividual shareholders, officers, or directors of a corporation *who are in a position to control trust assets*, and who breach their fiduciary duty to preserve those assets, may be held personally liable under PACA." *Golman-Hayden*, 217 F.3d at 351 (emphasis added); *see also Coosemans*, 485 F.3d at 705–06 (similar test); *Sunkist Growers*, 104 F.3d at 283 (same).

This case also presents the imprecision of a position-to-control test: an individual held one (or more) officer titles and was a 50% shareholder, but the evidence indicates she had no actual control over PACA trust assets. Appellants argue for a bright-line rule: If an individual is an officer, director, or shareholder of a corporation, then she is by that fact in a position to control the PACA trust assets. On this view, "position" is to be understood as meaning just that—one's *formal* position within the corporation. Context should not matter.

Needless to say, this is a temptingly simple approach. Yet we choose to reject it in favor of an approach that is more sensitive to how each corporation is actually managed, as we conclude that context should matter in these circumstances. Importantly, such a contextual approach finds support in the

---

814 F. Supp. 346 (S.D.N.Y. 1993).

17

decisions of other Courts of Appeals.[11]

---

[11] The parties spend considerable time arguing over the meaning of an early District Court case, *Shepard*. There, three individuals (the Kalecks) owned 100% of the stock of the corporate defendant, K.B. Fruit and Vegetables, Inc. ("KB"). They delegated the management of KB to the nephew of one of the defendants (Blumberg). The Kalecks "entered into the agreements [to set up the company], were signatories of [the company's] commercial banking agreement with Mellon Bank, applied for [the company's] business tax identification number, paid rent to the Terminal Corporation after Blumberg's operation ceased, and stored some of their produce in [the company's] stalls." 868 F. Supp. at 705. At the same time, they argued that "they were not actively involved in the operation of [the company]; that [Blumberg] was the true operator of [the company] during the period in question." *Id.*

The District Court rejected the Kalecks' argument, noting that they "were not merely uninvolved 'silent' corporate officers or shareholders, but rather established the business, albeit for Blumberg's sake, used the premises[,] and took action to continue the business after Blumberg abandoned it." *Id.* at 706. Interestingly, the Court explained that "the Kalecks [we]re not secondarily liable merely because they served as corporate officers or shareholders." *Id.* Indeed, it added that "there may be many small corporations in which an individual may hold corporate office or shares, for entirely legitimate purposes, and not exercise any day-to-day control over the company's affairs." *Id.*

The Kalecks' position is distinguishable from that of Mrs. Fleisher, as the evidence presented at trial established her lack

Take, for instance, the Ninth Circuit Court's decision in *Sunkist Growers*. There, a husband and wife were a corporation's "officers, directors, and sole shareholders" who allegedly "controlled its operations." *Sunkist Growers*, 104 F.3d at 281. A citrus producer brought a federal action "claim[ing] . . . that the [husband and wife], as fiduciaries, had breached their duties to maintain the [PACA] trust assets and pay [the producer]." *Id.* The Ninth Circuit Court concluded that the defendants may be individually liable under PACA, but not because of their formal titles. Instead, it explained that "[a] court considering the liability of [an] individual [under PACA] may look at 'the closely-held nature of the corporation, the individual's active management role[,]' and any evidence of the individual's acting for the corporation." *Id.* at 283 (quoting *Frio Ice v. SunFruit, Inc.*, 724 F. Supp. 1373, 1382 (S.D. Fla. 1989)). It then remanded to the District Court to apply the appropriate test in the first instance. Context mattered.

Similarly, in *Hiller Cranberry Products*, the First Circuit Court noted that PACA imposes liability on "'a *controlling* person of th[e] corporation, who uses the trust assets for any purpose other than repayment of the supplier.'" 165 F.3d at 9 (quoting *Morris Okun*, 814 F. Supp. at 348 (emphasis added)). This case involved a suit against an individual who was "the

_____

of power within the corporation to manage PACA assets. She was a corporate officer in a small corporation, and she, "for entirely legitimate purposes, . . . [did] not exercise any day-to-day control over the company's affairs." *Id.*

19

president and sole shareholder" of the produce dealer. *Id.* at 2. It resulted in a remand to the District Court to assess the potential liability of the individual defendant. Context again came into play.

The Fifth Circuit Court's decision in *Golman-Hayden* is not to the contrary. There, the Court concluded that the defendant's sole shareholder was liable under PACA because he "manifestly had absolute control of the corporation." *Golman-Hayden*, 217 F.3d at 351. Though the defendant "maintain[ed] that he was a passive shareholder," his position as the sole shareholder meant that he could "not escape liability based on a real or claimed failure to exercise his right and obligation to control the company." *Id.* Given his position, the defendant's "refusal or failure to exercise any appreciable oversight of the corporation's management was a breach of his fiduciary duty to preserve the trust assets." *Id.* Context once again mattered—the individual defendant three was necessarily responsible for "oversight of the corporation's management." *Id.* He could control entrusted assets.[12]

Taken together, these cases suggest a test (whether ascribed as "position of control" or otherwise) that takes into account formal position(s) but relies primarily on context. It

---

[12]In contrast, Mrs. Fleisher could not. Moreover, she was never the sole shareholder of Fleisher Produce. Instead, for a time, she was a 50% shareholder in a corporation that was controlled by the other shareholder, her husband.

calls on courts to: 1) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (*e.g.*, officer, director, and/or controlling shareholder); and 2) assess whether that individual's involvement with the corporation establishes that she was *actually* able to control the PACA trust assets at issue.[13] The ability to control is core. A formal title alone is insufficient—especially when faced with a small, "mom and pop" corporation such as Fleisher Produce, where formalities may be less meaningful.

We turn now to Mrs. Fleisher's involvement with Fleisher Produce and apply this test shorn only of its possibly misleading name.

## B.    Applying the Test to Mrs. Fleisher

Mrs. Fleisher's situation presents a close question under this contextual approach. Although there is some dispute whether she was an officer of the corporation, we assume

---

[13] Appellants argue that the District Court applied the wrong rule in this case. This criticism is overstated. It is true that the Court focused more on the broader question of Mrs. Fleisher's "active involvement" in the corporation than on the narrower (and more limited) question of her ability to control the PACA trust assets. Nonetheless, its analysis is consistent with the test we state here, as the level of active involvement in the relevant business may inform the ability-to-control inquiry.

without deciding that she was during the relevant 10-month time period in 2006–'07.[14]  This permits us to turn immediately to whether Mrs. Fleisher actually had the power to control the PACA trust assets at that time.

At the outset, we concede that there is evidence suggesting on the surface that Mrs. Fleisher was involved in operating the corporation and, therefore, may have given the

---

[14] Pennsylvania law has specific provisions for the removal of officers of a corporation.  *See* 15 Pa. Const. Stat. Ann. §§ 1726(a)(1), 1733.  Mr. Fleisher claims that he "resigned" his wife of her corporate titles and took away her shares in the corporation (whatever that means).  In 2004 he sent a letter to the federal Department of Agriculture asking that she be removed from the PACA license as a shareholder and Treasurer.  The District Court also considered handwritten minutes of an annual board meeting in 2005, where Mr. Fleisher accepted his wife's resignation as an officer.

In spite of these purported actions, it does not appear that Mrs. Fleisher was ever officially removed as an officer under Pennsylvania law.  In September 1982, the Articles of Incorporation identified Mrs. Fleisher as the corporation's Secretary and Treasurer.  When the company closed in 2007, the Pennsylvania Department of State's Corporation Bureau still listed Mrs. Fleisher as the corporation's Secretary.  We need not resolve this issue (or, as noted above, whether she was a Vice President during that period), however, as we believe that, regardless of her formal title(s), Mrs. Fleisher did not actually have the power to control the PACA trust assets.

22

perception that she could control the PACA trust assets.[15] Based on this evidence, appellants argue that Mrs. Fleisher controlled important aspects of the corporation's finances between May 2006 and March 2007 and, therefore, must be held individually liable for any breach of the PACA trust.

---

[15] For instance, on Fleisher Produce's 2004 and 2005 corporate tax returns, Mrs. Fleisher was listed as a 50% shareholder and a compensated officer. She also included a Form 6198 with her 2005 and 2006 individual federal tax returns, which is "filed by individuals and corporations participating in at-risk activities." In addition, she participated in certain business transactions as a corporate officer. When Fleisher Produce sold its warehouse, Mrs. Fleisher signed the real estate listing agreement as the corporation's Secretary (though typically we think of a corporate Secretary as one who attests the acts of others rather than binds the corporation). When Fleisher Produce entered into a loan modification agreement with Liberty Foods, Mrs. Fleisher signed it as the Fleisher Produce's Secretary. She also signed an incumbency certificate in connection with this loan in May 2006. Finally, in 1998, Mrs. Fleisher set up bank signature cards, listed herself as the corporation's Vice President, and signed several corporate checks based on her authority with respect to the bank account. For instance, in May 2006, a month that the parties stipulated as "representative of all other months," Mrs. Fleisher signed 12 of the 245 checks from Fleisher Produce's account. She contends that each of these actions was taken at the direction of her husband or Matsinger.

However, appellants' evidence must be read in light of the facts that were established at trial about the internal operations of Fleisher Produce. These factual findings, which are supported by the record, establish Mrs. Fleisher's very limited role in operating the corporation and lead us to conclude that, regardless of any formal title(s) or stock holdings, she did not have the ability to control PACA trust assets during the relevant time period.

Importantly, Mrs. Fleisher testified that she was not involved in any of Fleisher Produce's major business decisions and was never involved in the day-to-day management of the corporation. This assessment was confirmed by Mr. Fleisher's office manager (Matsinger) and by Mr. Fleisher himself, all in testimony that the District Court found credible. For instance, Matsinger testified that she supervised Mrs. Fleisher's work. Mrs. Fleisher worked only two to three days per week from 9:00 A.M. to 2:00 P.M for a weekly salary of $200. In that role, she performed "basic clerk level"—operational, as opposed to managerial—tasks, such as collecting tickets, writing checks (at the direction of Matsinger or her husband), and preparing payrolls. Mrs. Fleisher never supervised any Fleisher Produce employee.

Mr. Fleisher confirmed his wife's restricted and controlled operational role within the corporation. From May 2006 through March 2007, when Fleisher Produce paid out over $8 million, Mr. Fleisher testified that he never consulted with his wife about these payments. In fact, he explained that, in the

24

three decades that he ran Fleisher Produce, he never involved his wife in any business decisions. Instead, she remained his subordinate, taking directions from him (or Matsinger) on a daily basis.[16] In this role, Mrs. Fleisher never made suggestions to her husband about how to organize or manage the business. Operationally, Mr. Fleisher and Matsinger instructed Mrs. Fleisher on which checks to write or loan documents to sign. When Mr. Fleisher was traveling, Matsinger either made important business decisions on her own or received instructions from Mr. Fleisher. Neither relied on Mrs. Fleisher's judgment. When Fleisher Produce was forced to close, Mr. Fleisher did not consult with his wife before closing the business; he simply told her after the fact.

Mrs. Fleisher corroborated her husband's testimony as well as that of Matsinger. She confirmed that she never wrote checks on her own, but only when instructed to do so by her husband or Matsinger. She also did not review any corporate documents that her husband told her to sign; she simply signed them. In addition, she explained that there were no employees who were responsible to her, that she never examined the corporation's tax returns, and that she never directed another employee to pay a vendor. And, not to gild the lily, she worked only part-time. Collectively, this testimony supports the finding

---

[16]For example, Mr. Fleisher testified that Matsinger would tell Mrs. Fleisher to call debtors to collect accounts receivable. She was given this responsibility because of her "great personality."

25

that she had no actual ability to manage the corporation, and hence no power to control its use of PACA trust assets.

Appellants argue that, in spite of this evidence, Mrs. Fleisher should be held personally liable to the PACA trust creditors. They contend that the evidence establishes that she was a corporate officer of Fleisher Produce throughout its existence. Further, as a corporate officer, she had the apparent authority to sign checks and other documents that disposed of the corporation's assets. Given this, she was necessarily in a position to control the trust assets and must be held individually liable for failing to preserve them.

We disagree. The evidence presented at trial, and the District Court's findings of fact, support its conclusion that Mrs. Fleisher was not in a position to manage Fleisher Produce generally, and the trust assets specifically, in any meaningful way.

\* \* \* \* \*

Fleisher Produce was a "mom and pop" corporation in which "pop" had essentially all the power (and what he did not have was exercised by his office manager). At all times, Mrs. Fleisher was a mere subordinate lacking the ability to manage the entity or the PACA assets it held as a fiduciary—whether she was (formally) a corporate officer or not and regardless of the stock she may have held. This was established at trial, and we see no clear error that would require us to overturn the

26

District Court's factual findings. Therefore, we conclude that Mrs. Fleisher is not individually liable for breaching the corporation's fiduciary duties to the PACA trust because she did not have the actual ability to control its trust assets. We thus affirm.